UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
EARL GARRISON,

        Plaintiff/Counterclaim-Defendant,

        -against-

TOSHIBA BUSINESS SOLUTIONS
(USA). INC.,

        Defendant/Counterclaim-Plaintiff

        -and-

TOSHIBA AMERICAN BUSINESS
SOLUTIONS, INC.,

        Defendant.
----------------------------------------------------------X

## MEMORANDUM AND ORDER

CV 11-2214

(Wexler, J.)

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y
★ DEC - 3 2012 ★
LONG ISLAND OFFICE

APPEARANCES:

    ABRAMS, FENSTERMAN, EISMAN, GREENBERG
    FORMATO & EINIGER, LLP.
    BY: SARAH C. LICHTENSTEIN, ESQ.
    Attorneys for Plaintiffs
    1111 Marcus Avenue, Suite 107
    Lake Success, New York 11042

    BUCHANAN INGERSOLL & ROONEY, PC
    BY: PETER M. AVERY, ESQ.
    Attorneys for Defendants
    550 Broad Street, Suite 810
    Newark, New Jersey 07102

WEXLER, District Judge:

    This is an action commenced by Plaintiff Earl Garrison ("Plaintiff" or "Garrison") against

his former employer, Defendant Toshiba Business Solutions (USA), Inc. ("TBS"), and its

1

corporate parent, Toshiba America Business Solutions, Inc. ("TABS"). Plaintiff alleges only state law causes of action, and therefore jurisdiction is based solely on diversity of citizenship pursuant to 28 U.S.C. §1332. Presently before the court is the motion of Defendants, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment as to all of Plaintiff's claims.[1]

## BACKGROUND

### I. Factual Background

In the context of this motion for summary judgment the facts set forth below are drawn from documents properly before the court including testimony and the parties' statements pursuant to Rule 56.1 of the rules of this court.

#### A. The Parties and Garrison's Employment

Plaintiff is an individual residing in this district. TBS, a wholly owned subsidiary of TABS, is a dealer in office equipment including copiers, scanners and fax machines. Garrison was employed by TBS from 2006, until his termination on March 15, 2012. He commenced his employment with the company when TBS acquired Plaintiff's employer at the time, a company known as Candle Business Systems, Inc. ("Candle"). While employed by Candle, Plaintiff entered into an employment agreement (the "Candle Agreement"). A restrictive covenant contained within the Candle Agreement states that Garrison is prohibited from soliciting business from any of Candles' customers for a two year period following termination. Plaintiff was paid an additional $200,000 for agreeing to enter into the restrictive covenant contained in the Candle

---

[1] TBS has interposed counterclaims which are not presently before the court.

Agreement.[2]

During the course of his employment by TBS, Plaintiff worked in a variety of sales positions. Beginning his employment as a sales representative, Garrison was later promoted to the position of Regional Manager for Long Island and later, for the area encompassing New York and Westchester. As noted, Plaintiff was terminated on March 15, 2011. Garrison ultimately obtained new employment with a company known as U.S. Business Technologies ("USBT"). He began his employment with USBT in April of 2011 – just 27 days after his termination by TBS.

B.  The Reorganization of TBS

Difficulty appears to have arisen between Garrison and TBS beginning in late 2010 and early 2011, when the company began to reorganize its management. The president of the New York/New Jersey area was terminated in January of 2011, and that region was absorbed into the Northeast Region of TBS which was under the control of Bob Hallissy ("Hallissy"). Hallissy was a TBS regional president located in Massachusetts. Upon assumption of his new responsibilities, Hallissy decided to create the position of Sales Vice President for the New York region ("Sales VP/NY"). Plaintiff interviewed for the newly created position in January of 2011. Ultimately, the position was given to a different applicant, Jerry Masseur ("Masseur").

C.  Garrison's Conduct and An Investigation at TBS Prior to His Termination

TBS has submitted the affidavits of Hallissy and Masseur along with those of Dolores Molinaro, a TBS Human Resources Manager ("Molinaro"), and Joseph Ficarra, a TBS service technician ("Ficarra"). The affidavits of Hallissy, Masseur and Molino relate, inter alia, to

---

[2]  The court makes no findings, in the context of this motion, as to whether the Candle Agreement governs any claims in this lawsuit.

Garrison's absence from the office he was to have managed and his efforts, while still employed by TBS, to recruit TBS salespeople to leave their positions and join Garrison in a new venture in the same industry.

Additional affidavits and deposition testimony before the court refer to a February 2011 discovery of alleged irregularities regarding Garrison's expense report and an investigation with respect thereto. Statements alleged to have been made concerning this investigation form the basis of Plaintiff's defamation claim. Those statements are alleged by Plaintiff to have been made by TBS service technician Ficarra, to Steve Carballeira ("Carballeira"), a graphic material designer for the Town of Huntington (the "Town"), and Leo White ("White"), an officer at a company known as Duro Dyne Corporation ("Duro Dyne"). Both the Town and Duro Dyne were TBS customers.

Plaintiff alleges that Ficarra made a remark to Carballeira while Ficarra was servicing a TBS machine at the Town's print shop. The remark, which concerned the TBS investigation of Garrison is alleged to have been made when the Town was considering bids from TBS and USBT. Carballeira testified at his deposition that he knew Garrison since approximately 2002, when the Town was doing business with Candle. He testified further that Ficarra told him that if it were his decision, he "would be careful about going with [Garrison]" because he heard through TBS that Garrison was being "investigated for illegal doings." The discussion with Ficarra lasted, in Carballeira's estimation, less than two minutes, Carballeira stated that he was not the decision-maker with respect to the competing bids and he told no one at the Town about Ficarra's remarks. He further testified that he contacted Garrison who told him there was no truth to the remark. Carballeira stated that he took Garrison at his word and made no further inquiry

4

regarding any investigation.

Similar to the claim made with respect to Carballeira, Garrison claims that White told him that he heard from Ficarra that Garrison was under investigation for illegal activities. There is no testimony from White as to anything he heard directly from Ficarra. Indeed, White disputes Plaintiff's account. At his deposition, he stated that Ficarra told him that he was unaware of the reason why Garrison left Toshiba. Indeed, White testified that he recalled nothing being said by Ficarra about any investigation of Garrison. For his part, Ficarra denies the making of any remark, either to Carballeira, White, or anyone else regarding any investigation of Garrison. Ultimately, both the Town and Duro Dyne renewed their contracts with Toshiba.

### D. Plaintiff's Pursuit of a Position at Leslie Digital Imaging

Garrison alleges that after meeting with Masseur in February of 2011, he became convinced that his days at TBS were numbered and he therefore responded to a previously declined approach from TBS competitor Leslie Digital Imaging ("LDI"). Although Plaintiff explored this opportunity and met with LDI, he was not hired by that company. Before the court are affidavits and deposition transcripts of those who were involved in discussions with Garrison relating to the possibility of employment, and the decision not to go forward with that business relationship. Specifically, before the court are portions of the deposition transcripts of Ted LeBlanc, a TBS employee ("LeBlanc"), Jim Coler, an LDI branch sales manager for Northern New Jersey ("Coler") and Paul Schwartz, LDI's Chief Operating Officer ("Schwartz"). Pursuant to the LDI chain of command, Coler reports to Schwartz. Also before the court is the affidavit of Barry Bunsis, LDI's Chief Financial Officer ("Bunsis").

Coler, who was not the final decision maker with respect to the decision as to whether to

hire Garrison, was involved with discussions with Plaintiff about a possible position with LDI. According to Coler, LDI and Garrison never reached agreement as to a position, and it was Coler, as the direct point of contact, who ultimately advised Garrison that LDI had decided to go in another direction. It was Coler's recollection that the parties failed to come to terms because of issues regarding Garrison's base salary, LDI's concerns about a non-compete agreement with TBS, as well as Garrison's engagement in an outside business. Coler testified as to a single conversation he had with LeBlanc (a TBS employee) during which he recalled LeBlanc telling him that TBS would enforce its non-compete agreement with Garrison. LeBlanc testified that he told Coler that if Garrison violated any agreement he had with TBS, TBS would "go after him." Coler did not respond to LeBlanc's comments regarding the agreement, because it related to matters that were "beyond his level." Coler further testified that he did not recall telling anyone at LDI about his conversation with LeBlanc.

Schwartz, to whom Coler reports, testified clearly that while discussions were held with Garrison, LDI never made an offer of employment. Schwartz stated that the decision was made to terminate discussions with Garrison because he "was pushing for a decision and we weren't prepared to offer him a job." Schwartz explained that the "fit" was not right and there were concerns about a TBS non-compete agreement, as well as Garrison's side business.

Bunsis, an LDI decision maker, states unequivocally in his affidavit that the while LDI considered hiring Garrison, there was never a decision made to offer him a position. Among the reasons for this business decision, as set forth in the Bunsis affidavit, were Garrison's previous non-compete agreement and his engagement in a side business. Garrison received no offer of employment from LDI and as noted, obtained a position with USBT in April of 2011,

6

approximately one month after his dismissal from TBS.

II.  Plaintiff's Claims

There is no question but that Plaintiff was a TBS employee at will. Plaintiff acknowledges his at will status, and makes no claim for wrongful termination. Instead, his claims allege tortious interference with a prospective business relationship, defamation, intentional infliction of emotional harm and prima facie tort.

III.  The Motion for Summary Judgment

Defendants move for summary judgment dismissing all of Plaintiff's claims. The tortious interference claim is alleged to be barred because Plaintiff can show neither that LDI ever intended to offer him a position, nor that TBS engaged in any wrongful conduct. TBS seeks summary judgment as to the defamation claim on the ground that Plaintiff cannot show that a defamatory statement was made on behalf of TBS and Plaintiff cannot, in any event, show special damages. TBS states that even if Ficarra made the alleged comments regarding an investigation of Garrison, such comments were true and therefore not defamatory. It is further noted that any comment made by Ficarra cannot, in any event, be attributed to TBS as they were made outside of the scope of Ficarra's duties.

Both the intentional infliction of emotional harm claim and the claim of prima facie tort are sought to be dismissed on the ground that the conduct alleged in support of these claims do not differ from that alleged in support of Plaintiff's other claims. Both claims are further sought to be dismissed on the ground that the conduct alleged does not rise to the level required to sustain the claims. In opposition to the motion, Plaintiff alleges that material questions of fact preclude the entry of summary judgment as to all claims. After discussing the standards to apply

and the elements of the causes of action alleged, the court will turn to the merits of the motion.

## DISCUSSION

I. <u>Standard for Summary Judgment</u>

The party moving for summary judgment has the burden of establishing that there is no genuine issue of material fact in dispute, and that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986); <u>Ford v. Reynolds</u>, 316 F.3d 351, 354 (2d Cir. 2003). The Court should not grant summary judgment if there is "any evidence in the record that could reasonably support a jury's verdict for the non-moving party." <u>Ford</u>, 316 F.3d at 353; <u>Marvel Characters v. Simon</u>, 310 F.3d 280, 285-86 (2d Cir. 2002). In addition, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986).

Once the moving party discharges its burden of proof under Rule 56©, the party opposing summary judgment has the burden of coming forward with "specific facts showing that there is a genuine issue for trial." <u>Matsushita</u>, 475 U.S. at 586. A party opposing summary judgment may not rest upon mere allegation or denials of his pleading." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 256. "The mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. <u>Id.</u> at 247-48 (emphasis in original). Enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. <u>Anderson</u>, 477 U.S. at 248.

8

## II. Plaintiff's Causes of Action: Legal Principles

### A. Tortious Interference With Prospective Business Relationship

The elements of a cause of action for tortious interference with prospective economic advantage are: (1) existence of a profitable business relationship; (2) the tortfeasor's interference with that relationship; (3) the tortfeasor's use of dishonest, unfair, improper, or wrongful means; and (4) damage to the business relationship. Goldhirsh Group, Inc. v. Alpert, 107 F.3d 105, 108-09 (2d Cir.1997); Five Star Dev. Resort Communities, LLC v. iStar RC Paradise Valley LLC, 2010 WL 2697137 *4 (S.D.N.Y. 2010); P. Kaufmann, Inc. v. Americraft Fabrics, Inc., 198 F.Supp.2d 466, 472 (S.D.N.Y. 2002); Waste Services, Inc. v. Jamaica Ash and Rubbish Removal Co., 691 N.Y.S.2d 150 (2d Dep't. 1990; Fonar Corp. v. Magnetic Resonance Plus, Inc., 957 F.Supp. 477, 482 (S.D.N.Y.1997). To sustain such a cause of action a plaintiff must demonstrate that the interference was accomplished by "wrongful means." Waste Services, 691 N.Y.S.2d 150, 151 (2d Dep't. 1999) (cause of action for tortious interference with prospective contractual relations requires showing of "malice or wrongful conduct"); Snyder v. Sony Music Entertainment, Inc., 684 N.Y.S.2d 235, 239 (1st Dept. 1999). "Wrongful means" includes physical violence, fraud, misrepresentation, civil suits, criminal prosecutions and economic pressure. Id. A showing of "simple persuasion" is insufficient. Scutti Enterps. v. Park Place Entertainment Corp., 322 F.3d 211, 216 (2d Cir.2003).

### B. Defamation

Under New York law, establishing a claim for defamation requires a showing: "(1) that defendants made a false defamatory statement of fact; (2) that the statement was published to a third party; (3) that the statement concerned the plaintiff; (4) that the defendant was responsible

9

for making the statement; and (5) that the statement was slander per se or caused special damages." Baez v. JetBlue Airways, 745 F.Supp.2d 214, 225 (E.D.N.Y.2010); see Albert v. Loksen, 239 F.3d 256, 265-66 (2d Cir.2001). Defamation per se includes statements that "tend to injure another in his or her trade, business, or profession." Albert, 239 F.3d at 271.

An employer is liable for the defamatory conduct of an employee under a respondeat superior theory only if the employee, in committing the act complained of, was acting within the scope of his employment. Perks v. Town of Huntington, 251 F.Supp.2d 1143, 1166 (E.D.N.Y. 2003); see also Sellify Inc. v. Amazon.com, Inc., 2010 WL 4455830 *5 (S.D.N.Y. 2010) (agent responsible for defamation only if speaker was acting within scope of agency). When determining whether an employee acts within the scope of his employment, the court considers:

(1) whether the employee's act fell within the discretion and control of the employer;

(2) whether the employee acted under the express or implied authority of the employer;

(3) whether the employee's act was in furtherance of the employer's interests;

(4) whether the employee's acts were in the "discharge of duty' to the employer;

(5) whether the act was in execution of the employer's orders or part of the work assigned by the employer; and,

(6) whether the acts were 'so closely connected' with what the employee was hired to do, and "so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of employment.

Perks, 251 F. Supp.2d at 1166

### C. Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress under New York law,

a plaintiff must show: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." Davison v. Goodwill Industries of Greater New York and Northern New Jersey, Inc., 2012 WL 1067955 *4 (E.D.N.Y. 2012) (citations omitted). The conduct forming the basis of the claim must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Cruz v. Marchetto, 2012 WL 4513484 *5 (S.D.N.Y. 2012) (citations omitted). Generally, defamatory statements are not considered so extreme as to constitute the "extreme and outrageous" conduct required to support such a claim. Id., quoting, Carlson v. Geneva City Sch. Dist., 679 F. Supp.2d 355, 372 (W.D.N.Y.2010); see House v. Wackenhut Services, Inc., 2011 WL 6326100 *5 (S.D.N.Y. 2011). Indeed, even false statements as to criminal conduct have been held to be insufficient to state a claim. See Carlson, 679 F. Supp.2d at 372-73.

D. Prima Facie Tort

New York recognizes a cause of action in prima facie tort pursuant to the principle that unjustified intentionally inflicted harm is actionable. Curiano v Suozzi, 480 N.Y.S.2d 466, 469 (1984). A cause of action of prima facie tort consists of four elements: "(1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful." Id. Where plaintiff pleads a traditional tort, there is no cause of action for prima facie tort. Id. ("[o]nce a traditional tort is established the cause of action for prima facie tort disappears').

III.  Disposition of the Motion

A.  Tortious Interference With Prospective Business Relationship

As an initial matter, the court holds that there is no question but that LDI never reached the decision to hire Plaintiff. Even assuming that this decision was influenced by the perception that TBS might seek to enforce a restrictive covenant, such conduct does not reach the level of "wrongful"conduct necessary to state a claim for tortious interference of a prospective business relationship. This is true even if the Candle Agreement gave TBS no right of enforcement, and the court makes no findings as to that issue. The expression of an intent to enforce a non-compete agreement does not amount to wrongful tortious conduct sufficient to sustain Plaintiff's claim. Accordingly, the court grants Defendants' motion for summary judgment dismissing the claim of tortious interference with a prospective business relationship.

B.  Defamation

The statements forming the basis of Plaintiff's defamation claim are those allegedly made by Ficarra to Carballeira and White. While Ficarra denies making any such statement, Plaintiff comes forward with direct testimony from Carballeira as to the alleged Ficarra statement. As to any statement made to White, there is no direct testimony from White as to any statement made, and indeed, White does not remember Ficarra making any such statement. Instead, with respect to White, there is nothing before the court except for Garrison's statement that White told him that Ficarra told White about the investigation.

First, the court holds that Garrison's statement as to what While told him he heard from Ficarra is hearsay, and therefore does not constitute evidence in admissible form sufficient to be considered in the context of this motion. The court therefore considers only whether the alleged

12

statement by Ficarra to Carballeira is sufficient to survive Defendants' summary judgment motion as to any claim for defamation.

Considering the elements of a defamation cause of action as set forth above, the court holds that there are at least questions of fact as to whether a false statement of fact concerning the Plaintiff was made. While it may be true that Plaintiff was under some investigation concerning his expense account, it is not clear that there was an investigation as to criminal activity. The court further holds that an issue of fact exists as to whether the statement allegedly made by Ficarra can be considered as per se defamatory, and therefore not requiring a showing of special damages. As to this element, it is at least arguable that the Ficarra statement was one that might "tend to injure" Plaintiff in his business or profession.

Even assuming, however, the existence of questions of fact as to the issues above, summary judgment is warranted. That is because Plaintiff creates no issue of fact as to whether TBS can be held responsible for Ficarra's alleged statement to Carballeira. The court holds he has not. Plaintiff concedes as he must, that TBS can be responsible for the Ficarra statement (if made) pursuant only to a theory of respondeat superior. Such liability can be imposed only if Ficarra was acting within the scope of his employment at the time the statement was made. Here, there is no question but that Ficarra was a service technician whose responsibility was the servicing of TBS office equipment. While he may have engaged in idle chatter with customers, he did not speak for the company on personnel matters. Considering the factors set forth above with respect to determining the "scope of employment" issue, the court notes that Ficarra's conversations with customers did not fall within the discretion and control of TBS, he did not speak with the authority of TBS as to non-service related matters, it was not within the interests

of TBS for Ficarra to make comments about internal personnel matters, and speaking as to such matters certainly did not fall within the job Ficarra was hired to do. In short, while it might be foreseeable that Ficarra would make polite conversation while servicing office equipment, it was neither his job nor his responsibility to discuss internal TBS personnel investigations with TBS customers. Therefore, TBS cannot be held liable for any defamatory statements alleged to have been made by Ficarra. Accordingly, Defendants are entitled to the entry of summary judgment as to Plaintiff's claim for defamation. Accord Cruz v. Marchetto, 2012 WL 4513484 *7 (S.D.N.Y. 2012) (defamation claim based upon respondeat superior dismissed where statements made by employee did not fall within employee's job description or the business of his employer).

    C.    Intentional Infliction of Emotional Distress

According to Plaintiff, his claim for intentional infliction of emotional harm is not based only on his termination. Instead, Plaintiff alleges that his claim is supported by the way in which he was treated prior to his dismissal. Specifically, Plaintiff makes much of certain facts preceding his interview for the Sales VP/NY position. Plaintiff states that he was kept in the dark as to the position. He states further that he was made to travel in inclement weather to interview for the job, even though the position was destined to be given to a corporate insider. Additionally, Plaintiff relies on the facts recited above to support his claim of intentional infliction of emotional distress. Even assuming the truth of these facts, Plaintiff's allegations do not rise to the level necessary to support his claim. Such facts are not, when viewed in any light, the type of outrageous conduct necessary to state a claim. The claim for intentional infliction of emotional distress is therefore dismissed.

D.  Prima Facie Tort

Plaintiff's claim for prima facie tort is nothing more than a restatement of the same facts set forth above, including those alleged to support the claim for intentional infliction of emotional harm. Just as Plaintiff fails to set forth wrongful intentional conduct in support of his other claims, the court holds that Plaintiff fails to set forth facts sufficient to state a claim for prima facie tort.

## CONCLUSION

For the foregoing reasons, the court grants Defendants' motion for summary judgment in its entirety. The Clerk of the Court is directed to terminate the motion appearing at docket entry number 32. Jury selection as to the still pending counterclaims for breach of contract, misappropriation of trade secrets, tortious interference with business relations, breach of duty of loyalty, and unfair competition will be held on the previously scheduled date of June 10, 2013, with trial to follow.

SO ORDERED.

/s/ LEONARD D. WEXLER
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
       December 3, 2012